——— FILED ——— ENTERED
——— LODGED ——— RECEIVED

JUN 08 2005 **MR**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

# CV05-1045

CLAIRCOM DE MEXICO, a Mexican )
corporation, )
)
Plaintiff, )
)
v. )
)
AT&T WIRELESS SERVICES, INC. (n/k/a )
NEW CINGULAR WIRELESS SERVICES, )
INC.), )
)
Defendant. )
)

No.

**COMPLAINT FOR BREACH OF CONTRACT**



05-CV-01045-CMP

COMES NOW plaintiff Claircom de Mexico, S.A. DE C.V. ("CDM"), by and through

its attorneys Lane Powell PC, and alleges as follows:

## PARTIES

1.      Claircom de Mexico, S.A. DE C.V. ("CDM") is a corporation formed under

the laws of Mexico, having its principal place of business in Mexico City, Mexico.

2.      Defendant AT&T Wireless Services, Inc. ("AWS"), n/k/a New Cingular

Wireless Services, Inc., is a corporation formed under Delaware law, and having its principal

place of business in Redmond, Washington. AWS is a citizen of Delaware and Washington.

AWS is a successor to McCaw Cellular Communications, Inc., which was acquired by AT&T

Corporation in 1994, and subsequently, on or about July 2001, became an independent

company. Upon information and belief, AWS acquired or otherwise became the successor in

**COMPLAINT FOR BREACH OF CONTRACT** - 1

Case No.
119990.0001/1206225.1

ORIGINAL

1   interest to Claircom Communications Group, Inc. ("CCG"), a Delaware corporation.  In or

2   about October 2004, AWS was merged into a subsidiary of Cingular Wireless LLC, and

3   changed its name to New Cingular Wireless Services, Inc. ("NCWS").

4   ## JURISDICTION, VENUE, AND GOVERNING LAW

5   3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332.  The defendant is a

6   citizen of the State of Washington and/or the State of Delaware; the plaintiff is a Mexican

7   citizen.  The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8   4.      Venue is appropriate in this district under 28 U.S.C. § 1391(a).

9   5.      The parties' contract that is the subject of this litigation specifies "the law of

10  the State of Washington in the United States of America" as the applicable law pursuant to

11  which the subject agreement "shall be governed . . . and construed."

12  ## FACTUAL ALLEGATIONS

13  6.      On October 8, 1992, Claircom de Mexico, S.A. DE C.V. ("CDM") was

14  organized under the laws of Mexico for the purpose of operating the Mexican segment of an

15  integrated North American network (the "North American Network") that would provide air-

16  to-ground telecommunications services for airline passengers through a system operated

17  directly by Claircom Communications Group, Inc. ("CCG").

18  7.      On October 7, 1993, CDM obtained a license from the Mexican Ministry of

19  Communications and Transport (the *Secretaria de Communicaciones y Transportes* or

20  "SCT") – commonly referred to as an "SCT License" – which authorized CDM to operate the

21  Mexican segment of the North American Network.  Along with CDM's Mexican segment and

22  CCG's United States segment, a Canadian segment – involving a separate Canadian company

23  – allowed CCG to offer air-to-ground telecommunications services to passengers on domestic

24  and international flights all over North America.

25  8.      CCG and CDM, among others, entered into an agreement, entitled, "Joint

26  Venture Operation Agreement," dated as of July 14, 1995, to govern the operation of the

**COMPLAINT FOR BREACH OF CONTRACT** - 2

Case No.
119990.0001/1206225.1

**LANE POWELL PC**
1420 5TH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
(206) 223-7000

1    Mexican segment of the North American Network (the "Agreement").   A true and correct
2    copy of the Agreement is attached hereto as Exhibit A.

3        9.      CCG administered and operated the network from approximately 1995 through
4    approximately 2002.  Thereafter, CCG, which was acquired by AWS, apparently ceased all
5    operations with regard to the North American Network and stopped making payments to
6    CDM in accordance with the Agreement.   Additionally, AWS ceased all communications
7    with and failed to provide financial reports required by the Agreement.

8        10.     In accordance with Sections 5 and 6 of the Agreement, CCG promised to
9    undertake a number of obligations through the date of contractual termination of the
10   Agreement on December 31, 2009, including, but not limited to:   (1) cover CDM's "excess
11   cash requirements" for capital and operating requirements pursuant to approved budgets,
12   (2) deliver audited financial statements ninety (90) days after the end of each fiscal year and
13   forty-five (45) days after the end of each fiscal quarter, (3) carry out its duties under the
14   ["Joint"] Venture Documents, and  .  .  .  cause the persons nominated by [CCG] to act as
15   officers of CDM, to act in such a manner as shall not cause any material violation of any of
16   the terms and conditions of the SCT License, and (4) pay to the Mexican Shareholders of
17   CDM a quarterly fee, referred to as the "Network Contribution Fee" ("NCF") based upon the
18   gross revenues of the joint venture.

19       11.     In accordance with the terms of the Agreement, CCG and AWS made quarterly
20   NCF payments to CDM through the fiscal quarter ending in March 2000.  However, CCG
21   and/or AWS calculated NCF allocations payable to the Mexican shareholders of CDM for the
22   quarters ending June 2000 through June 2002.  CCG and AWS did not make these NCF
23   payments.  The total amount of NCF payments CCG and AWS failed to pay CDM is at least
24   $405,850.00.

25       12.     CCG's *successor-in-interest*, AWS, now known as *New Cingular Wireless*
26   Services, Inc. ("NCWS"), became a "Party in Default" as defined under Section 10(a)(i) of

**COMPLAINT FOR BREACH OF CONTRACT - 3**

Case No.
119990.0001/1206225.1

LANE POWELL PC
1420 5TH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
(206) 223-7000

1  the Agreement for failure to remit to CDM at least $405,850.00 in NCF payments. Pursuant
2  to this provision of the Agreement, CDM provided a ten-day notice of default to
3  AWS/NCWS.  AWS/NCWS failed to cure its default and has failed to respond to the notice.

4       13.   Section 10(b) of the Agreement is a liquidated damages provision in favor of
5  CDM, which specifically contemplates the "difficulty of determining the amount of the losses
6  by the Mexican Shareholders that would result from the default by [CCG/AWS]," which
7  deems CDM's losses to be a percentage of CCG/AWS' gross revenues during the fiscal
8  quarter or fiscal year ended prior to the occurrence of the default, less fees or commissions
9  paid to airlines, through December 31, 2009.

10      **FIRST CAUSE OF ACTION – BREACH OF CONTRACT**

11      14.   CDM realleges and incorporates herein Paragraphs 1 through 13, above, as
12 though fully set forth herein.

13      15.   CCG/AWS, now known as New Cingular Wireless Services, Inc. (referred to
14 hereafter as "NCWS"), breached the terms of the Agreement by, among other things, failing
15 to provide its annual and quarterly financial statements as required by the Agreement.
16 Following CDM's request for such documentation, NCWS provided the following
17 documents: (1) "draft" and "unaudited" Consolidated Balance Sheets for December 31, 1999
18 through December 31, 2000, (2) Audited Financial Statements for the years ending
19 December 31, 1996 and 1997, (3) Report on Audits of Consolidated Financial Statements for
20 the Years ending December 31, 1996 and 1995, and (4) "Calculation of Network Contribution
21 Fee, SCT License," for the quarters ending March 2000 through June 2002.  None of these
22 documents show that NCWS met the Agreement's reporting requirements.

23      16.   Based upon the documents NCWS has provided, NCWS materially breached
24 the Agreement when it stopped forwarding to the Mexican shareholders of CDM certain NCF
25 payments as required under the Agreement. The last NCF payment coincided with the quarter
26 ending March 2000 – even though NCWS' internal documents show calculations for such

**COMPLAINT FOR BREACH OF CONTRACT - 4**

Case No.
119990.0001/1206225.1

LANE POWELL PC
1420 5TH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
(206) 223-7000

payments through June 2002. The documents NCWS has provided show that NCWS owed CDM at least $405,850.00 in NCF payments as of June 2002. NCWS has failed to make such payments.

17. Pursuant to Section 10 of the Agreement, CDM provided a ten-day notice of default to NCWS, since CCG no longer exists. NCWS failed to cure its default and has failed to respond to the notice. NCWS has terminated the Agreement through its acts and omissions.

18. As a direct and proximate result of NCWS' breaches of the Agreement, CDM has suffered and will continue to suffer harm and damages in amounts to be proven at trial, together with CDM's reasonable attorneys' fees, costs, liquidated damages in accordance with the Agreement, and prejudgment interest.

## SECOND CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY

19. CDM realleges and incorporates herein Paragraphs 1 through 18, above, as though fully set forth herein.

20. As a joint venturer along with CDM under the Agreement, NCWS owes certain fiduciary duties of care and loyalty to CDM.

21. NCWS has breached its fiduciary duties to CDM by failing to deliver to CDM certain audited financial statements ninety (90) days after the end of each fiscal year and forty-five (45) days after the end of each fiscal quarter, during the term of the Agreement.

22. NCWS has also breached its fiduciary duties to CDM by jeopardizing the status of the SCT License.

23. CDM has been damaged and will continue to be damaged by NCWS' breaches of its fiduciary duties to CDM in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, CDM prays for the following relief:

**COMPLAINT FOR BREACH OF CONTRACT - 5**

Case No.
119990.0001/1206225.1

1       1.    For damages, including pre-judgment interest, against NCWS, in amounts to

2 be proven at trial;

3       2.    For liquidated damages as provided by the Agreement;

4       3.    For costs and reasonable attorneys' fees; and

5       4.    For such other and further relief as the Court deems just and equitable.

6      DATED this _7th_ day of June, 2005.

7                   LANE POWELL PC

By _____

John S. Devlin III, WSBA No. 23988
James B. Stoetzer, WSBA No. 06298

**COMPLAINT FOR BREACH OF CONTRACT - 6**

Case No.
119990.0001/1206225.1

LANE POWELL PC
1420 5TH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
(206) 223-7000

**EXHIBIT A**

JOINT VENTURE OPERATION AGREEMENT

dated as of July 14, 1995

by and between

CLAIRCOM COMMUNICATIONS GROUP, INC.

CONTROTITULOS, S.A. DE C.V.

GLOBALCOM, S.A. DE C.V.

and

CLAIRCOM DE MEXICO, S.A. DE C.V.

Providing for the Operation of a Joint Venture

with Respect to the Mexican Segment

of a North American Network for

Air-to-Ground Telecommunications

E950003.JER

# TABLE OF CONTENTS

<u>Section</u>                                                                                    <u>Page</u>

SECTION 1.  Definitions                                                          2

SECTION 2.  Representations and Warranties                      6

SECTION 3.  CDM Capital Structure and Corporate Governance      8

SECTION 4.  Operation of the Mexican Segment                   13

SECTION 5.  Covenant of the Mexican Shareholders; Network
                        Contribution Fee; Guarantee by Claircom          13

SECTION 6.  Covenants of Claircom                                   17

    (a)    Coverage of CDM Operating Losses                   17

    (b)    Financial Reporting                                        18

    (c)    Other Notices                                              18

    (d)    Compliance with SCT License                        18

SECTION 7.  Covenants of CDM                                      20

SECTION 8.  Rights of First Refusal; Sale Option              21

SECTION 9.  Cross-Border Revenue Sharing                     24

SECTION 10.  Termination                                            25

E950003.JER

<u>Section</u>                                                            <u>Page</u>

SECTION 11.   Strict Compliance by Claircom with the SCT
License; Indemnification                                                    31

SECTION 12.   Miscellaneous                                                32

    (a)   Notices                                       32

    (b)   Amendments                                    33

    (c)   Headings, Sections, Etc.                      34

    (d)   Successors; Assignments                       34

    (e)   Counterparts                                  34

    (f)   Payment of Certain Costs                      35

    (g)   Invalidity                                    35

    (h)   Waivers                                       35

    (i)   Publicity                                     35

    (j)   Entire Agreement                              36

    (k)   Language                                      36

    (l)   Payments                                      36

    (m)   Governing Law                                 36

    (n)   Judgment Currency, Etc.                       36

E950003.JER

**EXHIBITS**

A     Form of Services Agreement

B     Form of CDM Note

E950003.JER

## JOINT VENTURE OPERATION AGREEMENT

This AGREEMENT dated as of July 14, 1995 by and between: CLAIRCOM COMMUNICATIONS GROUP, INC. ("Claircom"), a corporation organized under the law of the State of Delaware; CONTROTITULOS, S.A. DE C.V. ("Controtítulos"), a corporation organized under the law of the United Mexican States ("Mexico"); GLOBALCOM, S.A. DE C.V. ("Globalcom" and, together with Controtítulos, the "Mexican Shareholders"), a corporation organized under the law of Mexico; and CLAIRCOM DE MEXICO, S.A. DE C.V. ("CDM"), a corporation organized under the law of Mexico,

### WITNESSETH:

WHEREAS, Industrias Bachoco, S.A. de C.V. ("Bachoco"), a predecessor of Controtítulos, and Claircom organized CDM on October 8, 1992 for the purpose of operating the Mexican segment (the "Mexican Segment") of an integrated North American network (the "North American Network") for air-to-ground ("ATG") telecommunications which would also cover (i) Canada through an arrangement between Claircom and Rogers Cantel Mobile Inc. ("Cantel"), a corporation organized under the federal laws of Canada, and (ii) the United States of America through a system operated directly by Claircom;

WHEREAS, CDM obtained a license (the "SCT License") from the Mexican Ministry of Communications and Transport (the *Secretaria de Comunicaciones y Transportes* or "SCT") on October 7, 1993, the SCT License authorizing CDM to operate the Mexican Segment;

WHEREAS, Bachoco, Claircom and Globalcom have invested the equivalent of approximately N$2,693,012 in CDM with a view to enabling CDM to commence operations as part of the North American Network, Controtítulos has acquired the shares of Bachoco in CDM and the parties wish to formalize their investments through the issuance of new share certificates as provided herein;

1

WHEREAS, after an extensive review of the technical requirements for operating the North American Network, the parties have determined that CDM and the Mexican Segment should be operated as set forth in this Agreement.

NOW, THEREFORE, the parties agree as follows:

SECTION 1.  DEFINITIONS.  As used herein, the following terms shall have the respective meanings set forth below:

"Affiliate" shall mean, with respect to any Person, any Subsidiary of such Person and any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person, and each Person who is the beneficial owner of 51% or more of any class of voting stock of such Person.  For purposes of this definition, "control" means the possession of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Allied Signal" shall mean Allied Signal Corporation.

"Amendment to Articles" shall mean an amendment to the Corporate Articles satisfactory to Claircom and the Mexican Shareholders in form and substance.

"Applicable Percentage" shall mean 0.8%.

"Approved Budgets" shall have the meaning specified in Section 4(b).

"ATG" shall have the meaning ascribed to such term in the first WHEREAS clause.

"Bachoco" shall have the meaning specified in the first WHEREAS clause.

"Business Day" shall mean any day other than Saturday, Sunday or other day on which commercial banks in Seattle, Washington,

2

U.S.A. or in Mexico City are authorized or required by law to be closed.

"Cantel" shall have the meaning specified in the first WHEREAS clause.

"Claircom" shall have the meaning specified in the first paragraph of this Agreement.

"CDM" shall have the meaning specified in the first paragraph of this Agreement.

"CDM Note" shall mean a promissory note duly executed by CDM, payable to Claircom and substantially in the form of Exhibit B.

"Controtítulos" shall have the meaning specified in the first paragraph of this Agreement.

"Corporate Articles" shall mean the by-laws (estatutos) of CDM, as they may be amended or modified from time to time, including without limitation by the Amendment to Articles.

"Cross-Border Revenues" shall mean, for any calendar month, the Revenues estimated to be attributable to ATG calls during such calendar month that would arise from U.S./Mexico international flights and/or domestic flights within Mexico and would utilize (i) existing Claircom ground stations in Harlingen, Texas; Marfa, Texas; El Paso, Texas; Tucson, Arizona; and San Diego, California; and (ii) any future Claircom ground stations in the U.S. located within fifty (50) miles of the U.S./Mexico border; provided, that (a) such monthly estimated Revenues shall be based upon a thirty (30) day sample taken by Claircom of actual Revenues attibutable to such calls; (b) the first such sample shall be taken within forty-five (45) days after the date of this Agreement, and shall determine the Cross-Border Revenues for each calendar month thereafter unless and until any new sample shall be taken by Claircom; (c) if Claircom, on the one hand, or the Mexican Shareholders, on the other hand, shall desire a new sample to be taken, Claircom will take a new thirty (30) day sample, which shall control the determination of Cross-Border Revenues for each

3

succeeding month unless and until a new sample shall be taken in accordance with the foregoing; and (d) no more than one such sample shall be requested or taken during any period of six (6) consecutive months.

"Dollars" shall mean lawful currency of the United States.

"Events of Termination" shall have the meaning specified in Section 10(a).

"Excess Cash Requirements" shall have the meaning specified in Section 6(a).

"Flitefone 800" shall mean the single-channel telecommunications system developed by Claircom for general aviation customers and currently marketed under the name "Flitefone 800".

"Globalcom" shall have the meaning specified in the first paragraph of this Agreement.

"Guaranteed Obligations" shall have the meaning specified in Section 5(e).

"Indemnitee" shall have the meaning specified in Section 11(c).

"Material Effect" shall have the meaning specified in Section 6(a).

"Mexican Segment" shall have the meaning specified in the first WHEREAS clause.

"Mexican Shareholders" shall have the meaning specified in the first paragraph of this Agreement.

"Mexico" shall have the meaning specified in the first paragraph of this Agreement.

"net available cash" shall have the meaning specified in Section 5(b).

4

"Net Cash Flow" shall have the meaning specified in Section 5(b).

"Network Contribution Fee" shall have the meaning specified in Section 5(b).

"New JV Fees" shall have the meaning specified in Section 10(c).

"NP$" shall mean lawful currency of Mexico.

"North American Network" shall have the meaning specified in the first WHEREAS clause.

"Offer" shall have the meaning specified in Section 8(a).

"Offered Shares" shall have the meaning specified in Section 8(a).

"Original Currency" shall have the meaning specified in Section 12(n).

"Party in Default" shall have the meaning specified in Section 10(a).

"Person" shall mean an individual, partnership, corporation (including, without limitation, a business trust), joint stock company, trust, unincorporated association, joint venture or other entity, or a governmental authority.

"Revenues" shall mean gross revenues received by Claircom for ATG services during any applicable period, net of any charges paid by Claircom for transmission, interconnection, credit card validation and related services, airline or general aviation aircraft commissions, credits and adjustments, bad debt expenses and excise taxes.

"SCT" shall have the meaning specified in the second WHEREAS clause.

5

E950003.JER

"SCT License" shall have the meaning specified in the second WHEREAS clause.

"Selling Shareholder" shall have the meaning specified in Section 8(a).

"Services Agreement" shall mean a Services Agreement between Claircom and CDM substantially in the form of Exhibit A.

"Shareholders" shall mean Claircom and the Mexican Shareholders.

"Subsidiary" shall mean, with respect to any Person, a corporation a majority of the shares of any class of voting stock of which shall be owned by such Person.

"Substitute Currency" shall have the meaning specified in Section 12(n).

"Term" shall mean the term of this Agreement, including any extended term, as provided in Section 10(a).

"Third Party Claim" shall have the meaning specified in Section 11(b).

"Transfer" shall mean, with respect to any property or rights, any transfer, sale or other disposition thereof.

"U.S./Mexican Systems" shall mean the Mexican Segment and the U.S. segment of the North American Network.

"United States" or "U.S." shall mean the United States of America.

"Venture Documents" shall mean this Agreement and the Services Agreement.

SECTION 2. REPRESENTATIONS AND WARRANTIES. The parties represent and warrant to each other as follows:

6

A.   Each Shareholder represents and warrants to the other parties that (i) it is duly incorporated and organized and in good standing under the law of the jurisdiction of its incorporation, (ii) it has full corporate power and authority to make and perform this Agreement and the other Venture Documents to which it shall be a party and to consummate the transactions contemplated hereby and thereby, (iii) the making and performance of the Venture Documents and the consummation of the transactions contemplated thereby will not violate or constitute a default under any contract, agreement, court order or arbitral award binding on it or any of its property, the SCT License or any applicable law or regulation of which it has knowledge, and (iv) none of the events referred to in Section 10 has occurred with respect to it as a "Party in Default".

B.   Claircom represents and warrants to the other parties that (i) it has the requisite technical expertise to establish the North American Network and to perform its obligations under the Venture Documents, (ii) the copy of its balance sheet dated as at December 31, 1994 and its income statement for the fiscal year ended on such date, certified by Arthur Andersen & Co., independent public accountants, and heretofore delivered to the Mexican Shareholders, is a true and correct copy of such balance sheet and income statement, (iii) such balance sheet and income statement were prepared in accordance with generally accepted accounting principles and practices and fairly reflect the financial condition of Claircom as at December 31, 1994 and the results of its operations for such fiscal year, (iv) no material adverse change has occurred in the financial condition, business or affairs of Claircom since December 31, 1994, and (v) all authorizations, permits, consents or approvals required to be obtained from any governmental authorities or agencies for it to operate the North American Network, other than those required to be obtained from governmental authorities or agencies in Mexico, have been obtained and are in full force and effect.

C.   CDM represents and warrants that (i) CDM is duly incorporated and organized under the law of Mexico, (ii) it has full corporate power and authority to make and perform this Agreement and the other Venture Documents to which it shall be a party and to consummate the transactions contemplated hereby and thereby, (iii)

7

the making and performance of the Venture Documents and the consummation of the transactions contemplated thereby will not violate or constitute a default under any contract, agreement, court order or arbitral award binding on it or any of its property, the SCT License or any applicable law or regulation of which it has knowledge, (iv) the SCT License was duly issued by the SCT and remains unchanged and in full force and effect, (v) the SCT License authorizes the operation of the Mexican Segment as currently understood by CDM, (vi) to the best of its knowledge CDM is not presently under investigation concerning the SCT License and CDM has not received any notice or complaint concerning, or any threat to terminate or otherwise restrict, the SCT License, (vii) no other authorizations, permits, consents or approvals are required to be obtained from governmental authorities or agencies in Mexico in connection with the operation of the Mexican Segment in accordance with the SCT License other than any routine zoning or similar permits that may be required from local authorities in Mexico in connection with the siting of the ground stations to be used in the Mexican Segment, (viii) the copy of the balance sheet of CDM dated as at December 31, 1994 which was heretofore delivered to each of the Shareholders is a true and correct copy thereof, (ix) such balance sheet was prepared in accordance with generally accepted accounting principles and fairly reflects the financial condition of CDM as at such date, (x) CDM is not presently a party to, and has received no threat concerning, any lawsuit, claim or other proceeding, and (xi) CDM has heretofore delivered to each of the Shareholders true and correct copies of its Corporate Articles and minutes of its Board and Shareholders' meetings.

D.   Each Mexican Shareholder represents and warrants that to the best of its knowledge the SCT License was duly issued by the SCT and the SCT has no present intention of revoking or canceling the SCT License.

SECTION 3.   CDM CAPITAL STRUCTURE AND CORPORATE GOVERNANCE.

(a) The parties agree that the capital structure of CDM shall be changed in order that Controtítulos shall have 50% of the common capital stock of CDM, Claircom shall have 35% of such common

8

capital stock and Globalcom shall have 15% of such common capital stock.  Such changes in the capital stock of CDM shall be effected by Controtítulos, Claircom and Globalcom acquiring such number of newly issued shares of CDM as shall be necessary to cause such changes in the percentage ownership of the capital stock of CDM, at a subscription price which shall be equivalent to the amount theretofore invested in CDM by Controtítulos, Claircom and Globalcom.  After giving effect to such changes, Controtítulos shall own 50% of the shares of the capital stock of CDM, Claircom shall own 35% of the shares of the capital stock of CDM and Globalcom shall own 15% of the shares of the capital stock of CDM.

(b) To reflect the aforesaid changes in the capital structure of CDM, the parties agree that Controtítulos and Claircom shall each elect 40% of the members of the Board of Directors of CDM and Globalcom shall elect 20% of the members of such Board, and the terms of such directors shall commence as of the date of their election to the Board.

(c) Claircom, Controtítulos and Globalcom agree that, after giving effect to the actions referred to in paragraph (a) of this Section 3, they shall call and conduct an ordinary meeting of the Shareholders in order to give effect to the election of directors referred to in paragraph (b) of this Section 3, to adopt the Amendments to Articles and to take such other steps as shall be necessary to give effect to the foregoing and other provisions of this Agreement; and Claircom, Controtítulos and Globalcom will vote in favor thereof.  The Amendment to Articles shall be notarized and registered in the Public Registry of Commerce for the domicile of CDM.

(d) Each certificate for shares in CDM shall have a legend in Spanish conspicuously noted thereon which shall state the equivalent of the following:

The shares evidenced by this certificate are subject to the terms of a Joint Venture Operation Agreement, a copy of which is available for examination at the chief executive office of the corporation, and to restrictions on transfer as provided in the by-laws (estatutos) of the corporation.

9

(e) In addition to the requirements of applicable law, at least 80% of the directors of CDM must be present at any meeting of the Board of Directors of CDM in order for a quorum to be present for the transaction of business at such meeting, and the Corporate Articles shall so provide. Meetings may be conducted by telephone, provided that the resolutions adopted at such meetings are later unanimously confirmed and ratified by the members of the Board in writing.

(f) Except as otherwise provided by law, (i) only the Shareholder which has designated a Director may initiate proceedings to remove such Director from the Board of CDM, and (ii) if any Shareholder requests the removal of a Director that was designated by such Shareholder, the other Shareholders agree to vote their shares in CDM in favor of the candidate designated by the Shareholder requesting the removal of the departing Director.

(g) The Board of Directors of CDM shall have exclusive authority to appoint and replace the executive officers of CDM. The Shareholders shall not appoint or replace any of the executive officers of CDM without the holders of at least 66-2/3% of the shares of CDM approving such action.

(h) CDM shall deliver to each of the Shareholders:

(i) as soon as practicable, but in any event within forty-five (45) days after the end of each fiscal year of CDM, a balance sheet as at the end of such fiscal year and an income statement and statement of cash flows for such fiscal year, in each case prepared in accordance with generally accepted accounting principles in Mexico and certified by the chief financial officer of CDM;

(ii) as soon as practicable, but in any event within one hundred twenty (120) days after the end of each fiscal year of CDM, a balance sheet as at the end of such fiscal year and an income statement and statement of cash flows for such fiscal year, in each case prepared in accordance with generally accepted accounting principles in Mexico and certified by independent chartered accountants of nationally recognized standing in Mexico;

10

(iii) as soon as practicable, but in any event within thirty (30) days after the end of each fiscal quarter of CDM, a balance sheet as at the end of such fiscal quarter and an income statement for such fiscal quarter, in each case prepared in accordance with generally accepted accounting principles in Mexico and certified by the chief financial officer of CDM;

(iv) as soon as practicable, but in any event within thirty (30) days after the end of each calendar month, a balance sheet as at the end of such month and an income statement for such month, in each case prepared in accordance with generally accepted accounting principles in Mexico and certified by the chief financial officer of CDM.

Each financial statement delivered pursuant to this paragraph (h) shall be accompanied by a reconciliation of such financial statement with the Approved Budget for the relevant period.

(i) CDM shall not take any action or enter into any contract not provided for in or contemplated by the Approved Budgets, unless otherwise approved by the holders of at least 66-2/3% of the shares of the common stock of CDM. Without limiting the generality of the foregoing, none of the following actions shall be taken without the prior consent of the holders of at least 66-2/3% of the shares of the common stock of CDM:

(i) any amendment to the Corporate Articles;

(ii) the creation of any committee of the Board of Directors of CDM;

(iii) any change in the number of the members of the Board of Directors of CDM;

(iv) any amalgamation, consolidation, merger, plan of arrangement or other combination of CDM with any company, association, partnership or other entity;

(v) except in the ordinary course of business, any sale,

11

lease, exchange, transfer, mortgage, pledge or other disposition of, or the creation of any encumbrance on, any of the business, real or personal property or other assets of CDM;

(vi) the creation or assumption by CDM of any indebtedness of any nature whatsoever, unless provided for in or contemplated by the Approved Budgets;

(vii) the selection of independent accountants to advise CDM and to audit the financial statements of CDM;

(viii) the purchase or other acquisition by CDM of any business, land, buildings or fixtures, or any right or interest therein, or entering into any commitment to do any of the same, unless provided for or contemplated by the Approved Budgets or the Venture Documents;

(ix) the execution or performance of any material contract or arrangement not provided for or contemplated by the Approved Budgets or this Agreement;

(x) except as otherwise provided in this Agreement, the issuance of capital stock of CDM or rights to acquire any thereof;

(xi) except as otherwise provided in the Venture Documents, the payment by CDM of any dividend, distribution or other amount to any shareholder of CDM;

(xii) the election of any of the executive officers of CDM;

(xiii) the initiation by CDM of any dissolution, liquidation, suspension of payments or bankruptcy proceeding with respect to CDM;

(xiv) the granting by CDM of any power of attorney;

(xv) the approval of the Approved Budgets, or any

12

modification of any thereof:

(xvi) the suspension by CDM of ATG service, except for temporary technical failures; or

(xvii) any decision by CDM to render any new line of services not theretofore rendered by CDM, or to manufacture, assemble or sell any new line of products not theretofore manufactured, assembled or sold by CDM or to discontinue the sale of any products or services theretofore sold by CDM.

The requirements set forth above in this paragraph (i) of Section 3 shall be established through the Amendment to Articles.

SECTION 4.  OPERATION OF THE MEXICAN SEGMENT.  The parties agree that the Mexican Segment shall be operated pursuant to agreements between CDM and Claircom, as follows:

(a) Simultaneously with the execution of this Agreement, Claircom and CDM shall enter into the Services Agreement, substantially in the form of Exhibit A, under which Claircom shall provide to CDM the administrative, consulting and marketing services necessary for the operation by CDM of the equipment and ground stations to be used in the Mexican Segment.  The Services Agreement shall provide, among other things, for protection of the intellectual property rights of Claircom related to the services provided to CDM thereunder.

(b) The parties agree that all capital and operating budgets of CDM shall require the approval of the holders of 66-2/3% of the shares of the capital stock of CDM (budgets so approved being herein called the "Approved Budgets").  CDM shall operate only in accordance with the Approved Budgets and the provisions of this Agreement.

SECTION 5.  COVENANT OF THE MEXICAN SHAREHOLDERS; NETWORK CONTRIBUTION FEE; GUARANTEE BY CLAIRCOM.

(a) The Mexican Shareholders agree that during the Term of this Agreement they will use their best efforts to cause the SCT License to

13

be maintained in full force and effect.

(b) In consideration for the Mexican Shareholders having enabled CDM to obtain the SCT License and agreeing to the covenant set forth in paragraph (a) of this Section 5, CDM will pay to the Mexican Shareholders an annual fee (the "Network Contribution Fee"), with respect to each fiscal quarter of Claircom, commencing with the fiscal quarter ending on June 30, 1995, accruing from the date of this Agreement, equal to (x) in the case of Controtítulos, 76.92307%, and (y) in the case of Globalcom, 23.07692%, of the amount which shall be the greater of (I) 1% of the gross revenues received by Claircom (as per the financial statements of Claircom) during such fiscal quarter, less fees or commissions paid to airlines, from the operation of the terrestrial portion of the North American Network; and (II) 65% of the net available cash at the end of such fiscal quarter (the "Net Cash Flow" for such fiscal quarter) from the operations of CDM ("net available cash" for any fiscal quarter to mean the ending cash balance of CDM for such quarter after receipt of all cash revenues and payment of all cash expenditures, net of reserves for future budgeted operating expenses, debt service, debt repayment and capital spending (counting only once in such calculation any item of expense or reserve)); provided, that (A) for any period (including the period commencing on the date of this Agreement) of less than a full fiscal quarter, the Network Contribution Fee shall be equal to 1% of the gross revenues received by Claircom during such period, less fees or commissions paid to airlines, from the operation of the terrestrial portion of the North American Network, and (B) no Network Contribution Fee shall be payable with respect to any period unless during or prior to such period CDM shall have installed at least one (1) ground station in Mexico. The Network Contribution Fee shall be payable by CDM to the Mexican Shareholders within thirty (30) days after the delivery by Claircom to the Mexican Shareholders of the certified quarterly financial statements required to be delivered pursuant to Section 6(b)(ii), shall be payable in Dollars and in immediately available funds and shall be independent of any dividends paid by CDM to its shareholders.

(c) If the amount referred to in clause (II) in paragraph (b) of this Section 5 shall be greater than the amount referred to in clause (I)

14

therein with respect to any fiscal quarter of Claircom, then CDM shall pay to Claircom a fee, in consideration of the services provided and obligations incurred by Claircom under this Agreement, in addition to all other amounts payable to Claircom under any of the Venture Documents, equal to 35% of the Net Cash Flow for such fiscal quarter.

(d) Claircom agrees to deliver to the Mexican Shareholders and to CDM the financial statements of Claircom referred to in paragraph (b) of this Section 5 in a timely manner such that CDM will be enabled to make the payments required to made by CDM under such paragraph within the periods specified therein.

(e) Claircom hereby unconditionally and irrevocably guarantees the payment in full when due of all of the amounts payable by CDM to the Mexican Shareholders under paragraph (b) of this Section 5 (the obligations of CDM to make such payments being hereinafter called the "Guaranteed Obligations"). The obligations of the Guarantor hereunder are absolute, unconditional and irrevocable and for the full amount of the Guaranteed Obligations, as if Claircom were the main obligor and not a guarantor, and shall be governed by the following clauses (I) through (VIII) of this Section 5(e):

(I) Claircom shall forthwith, upon simple demand and upon CDM's failure to timely pay the Guaranteed Obligations, pay and perform the Guaranteed Obligations owing to the Mexican Shareholders and pay to each such Mexican Shareholder any and all costs and expenses (including, without limitation, attorney's fees and expenses) which may be incurred by such Mexican Shareholder in enforcing or seeking to enforce this guarantee.

(II) All payments to be made under this guarantee shall be made by Claircom to the respective Mexican Shareholder, in Dollars and in immediately available funds, at the place specified in Section 12(I), without set-off or counterclaim, but subject to any applicable present or future taxes, levies, duties, deductions, withholdings or other charges of whatsoever nature imposed, levied, collected, withheld or assessed by the United States or any political subdivision or taxing authority thereof or therein

15

E950003.JSR

(other than any such taxes, levies, duties, deductions, withholdings or other charges with respect to the income of Claircom).

(III) This guarantee shall continue in full force and effect regardless of whether either Mexican Shareholder shall:

(A) take or hold any security for the performance of all or any part of the Guaranteed Obligations and exchange, substitute, increase, decrease, enforce, waive or release any such security;

(B) neglect or forbear to enforce the Guaranteed Obligations; or

(C) enforce any of its rights or remedies against CDM, with respect to all or any part of the Guaranteed Obligations.

(IV) Claircom hereby waives presentment, demand, diligence, protest or notice of dishonor, nonpayment or other default with respect to any of the Guaranteed Obligations.

(V) The obligations assumed by Claircom hereunder shall not be affected by the absence of any judicial request for payment from the Mexican Shareholders to CDM and whether or not the Mexican Shareholders shall take any action within the time set forth in Articles 2848 and 2849 of the Civil Code, and Claircom hereby expressly waives the provisions of such Articles.

(VI) Claircom hereby waives any right of subrogation which Claircom may have with respect to the Guaranteed Obligations until the Guaranteed Obligations shall have been fully paid and performed and the payment by Claircom of all costs and expenses to the Mexican Shareholders, as set forth in paragraph (II) of this Section 5(e), shall have been fully made.

16

E950003.JER

(VII) The parties hereto expressly agree that upon the failure by CDM to comply with any of the Guaranteed Obligations, the related Mexican Shareholder may exercise any or all of its rights under this guarantee.

(VIII) This guarantee shall remain in full force and effect as the continuing obligation of Claircom until all of the Guaranteed Obligations shall have been fully paid and performed and until all costs and expenses which may be incurred by the Mexican Shareholders in enforcing or attempting to enforce this guarantee shall have been paid in full.

SECTION 6.  COVENANTS OF CLAIRCOM.  Claircom agrees with the Mexican Shareholders and CDM that, in consideration of their respectively agreeing to comply with the covenants in Sections 5 and 7, which make the establishment and operation of the Mexican Segment possible and which is expected to contribute to the success of the North American Network, in which Claircom has a substantial financial interest, from the date of this Agreement to the date on which this Agreement shall terminate:

(a) Coverage of Excess Cash Requirements of CDM.  If the revenues of CDM shall fail to meet the capital and operating cash requirements of CDM which shall not exceed those specified in the Approved Budgets (the portion of such cash requirements not met by the revenues of CDM being its "Excess Cash Requirements"), Claircom shall fund such Excess Cash Requirements by advancing to CDM cash in principal amounts equal to the amounts of such Excess Cash Requirements; provided, that (i) against receipt of each such advance CDM shall execute and deliver to Claircom a CDM Note in a principal amount equal to the amount of such advance, dated the date of such advance and otherwise substantially in the form of Exhibit B, and (ii) each CDM Note shall be subordinated to indebtedness owing to any other creditor of CDM approved by Claircom.  Each CDM Note shall be subject to prepayment and acceleration as set forth in such CDM Note. CDM will not pay any dividends to its shareholders during the life of any CDM Note until such CDM Note shall be paid in full.

17

(b) <u>Financial Reporting</u>.  Claircom shall deliver to each of the Mexican Shareholders and CDM, (i) not later than ninety (90) days after the end of each fiscal year of Claircom, audited financial statements of Claircom for such fiscal year, including the balance sheet of Claircom as at the end of such fiscal year and the income statement for such fiscal year, certified by independent public accountants of recognized regional or national standing, together with a statement certified by the President of Claircom specifying the calculation of the Network Contribution Fee for such fiscal year or such other period as may be applicable, and (ii) not later than forty-five (45) days after the end of each fiscal quarter of Claircom, financial statements of Claircom for such fiscal quarter, including the balance sheet of Claircom as at the end of such fiscal quarter and the income statement of Claircom for such fiscal quarter, certified by the chief financial officer of Claircom.  Each of such financial statements shall be prepared in accordance with generally accepted accounting principles and practices in the United States of America, and the statement referred to in clause (i) above shall be prepared in sufficient detail to demonstrate the gross revenues, less fees or commissions paid to airlines, generated by the operation of the North American Network and, if applicable, of the Mexican Segment. The Mexican Shareholders shall together have the right, which may be exercised no more often than once each twelve (12) months, to inspect Claircom's books of account and records concerning the calculation of the Network Contribution Fee.

(c) <u>Other Notices</u>.  Claircom shall notify each of the Mexican Shareholders in writing of (i) any judgment, arbitral award or order entered against Claircom in any legal or arbitral proceeding for an amount exceeding US$250,000 or the equivalent, (ii) any governmental or administrative action or determination or technical or scientific development which in the judgment of Claircom shall or may have a material adverse effect on the operation of the North American Network, and (iii) any other event that shall have a material adverse effect on the financial condition, business or affairs of Claircom.

(d) <u>Compliance with SCT License</u>.  Claircom shall carry out its duties under the Venture Documents, and shall cause the persons nominated by it to act as officers of CDM to act, in such a manner as

18

E950003.JER

shall not cause any material violation of any of the terms and
conditions of the SCT License; provided, that (i) Claircom shall not be
responsible under this paragraph (d) for any action by CDM which shall
not have been approved by Claircom or any person nominated by it to
act as an officer of CDM, and (ii) if the terms or conditions of the SCT
License or any laws, rules or regulations related thereto shall be
materially modified, amended or otherwise changed and Claircom shall
notify the other parties hereto not later than ninety (90) days after
such modification, amendment or change shall become effective that
such modification, amendment or change will or is likely to, in the
judgment of Claircom, materially and adversely affect the operation of
the Mexican Segment in that it would no longer be technically or
economically feasible, applying a reasonable business judgment
standard, for CDM to continue to operate the Mexican Segment
(hereinafter, a "Material Effect"), then Claircom shall thereupon be
entitled to terminate this Agreement pursuant to Section 10(d), except
that if within forty-five (45) days after receiving the notification
referred to in clause (ii) of this proviso the Mexican Shareholders shall
give notice to Claircom that in their judgment such modification or
amendment may be reversed or rendered ineffective, or that it will not
cause or result in a Material Effect, then the matter shall be subject to
arbitration in accordance with the following provisions:

(A) Within five (5) days after such notice shall be given to
Claircom by the Mexican Shareholders, Claircom, on the one
hand, and the Mexican Shareholders together, on the other hand,
shall each select one (1) arbitrator, and within seven (7) days
after the appointment and acceptance of the two arbitrators,
they shall select a third arbitrator for the arbitration panel.

(B) The arbitrators so selected shall proceed to conduct the
arbitration in Seattle, Washington, U.S.A. in accordance with the
International Arbitration Rules of the American Arbitration
Association, and shall hold a hearing on the matter within fifteen
(15) days of the appointment and selection of the third
arbitrator. Prior to such hearing, Claircom, on the one hand, and
the Mexican Shareholders together, on the other hand, shall be
entitled to deliver to the arbitration panel a written statement
setting forth its or their position on the matter, such statement

19

not to exceed twenty (20) pages in length. The arbitrators shall be entitled to ask questions of the parties at the hearing and to require supplemental information to be presented in writing.

(C) Within seven (7) days after the hearing, the panel shall render its determination on the matter pursuant to a majority vote. Such determination shall accept in full the position taken by either Claircom or the Mexican Shareholders as to whether or not the modification, amendment or change of the SCT License or related laws, rules or regulations would, or were likely to, cause or result in a Material Effect, and shall be final and binding on the parties.

(D) If the arbitration panel's decision shall be in favor of the position of Claircom, or if the Mexican Shareholders shall have failed to bring a demand for arbitration within the forty-five day period mentioned above, then this Agreement shall terminate and the parties shall have no further obligations under this Agreement, or the other Venture Documents, including without limitation any obligation resulting from any subsequent loss of the SCT License or pursuant to Section 10 or 11.

SECTION 7. COVENANTS OF CDM. CDM agrees that during the Term of this Agreement it will, unless the holders of at least 66-2/3% of its shares shall otherwise give their prior written consent:

(a) Remain a corporation in existence under all applicable laws and regulations of Mexico;

(b) Not take any action, or fail to take any action, that would cause CDM to be in default under any material contract or financial obligation, including, but not limited to, its obligations under the Venture Documents;

(c) Use its best efforts to maintain the SCT License in full force and effect and to take such actions as shall be recommended by Claircom as being necessary and appropriate to enable the Mexican Segment to be operated efficiently and as an integral part of the seamless North American Network;

20

(d) Act in good faith in its dealings with Claircom and Cantel;

(e) Use its best efforts to take all actions as shall be recommended by Claircom as being necessary and appropriate to assure network and call quality of the Mexican Segment;

(f) Use its best efforts to actively support Claircom in its marketing efforts in Mexico with respect to the North American Network;

(g) Use its best efforts to ensure that at all times the Mexican Segment is and remains compatible with the rest of the North American Network, as it now exists and as it may be modified from time to time, with a view to forming a seamless ATG communications network for commercial and general aviation aircraft;

(h) Use its best efforts to cooperate with Claircom in securing long-term contracts to provide ATG public telephone service with Mexican commercial airlines;

(i) Use its best efforts to cooperate with Allied Signal and Claircom to promote and market Flitefone 800 in the Mexican general aviation market, on the understanding that Allied Signal has received from Claircom the exclusive worldwide right to market Flitefone 800; and

(j) Give notice to each of the Shareholders, within two (2) Business Days after CDM shall obtain knowledge of the same, of any event or development which shall or may be materially adverse to the business, affairs or financial condition of CDM, including without limitation any such event or development which shall or may create a significant risk that the SCT License might be terminated.

SECTION 8.  RIGHT OF FIRST REFUSAL: SALE OPTION.

(a) Right of First Refusal.

    (i) Each Shareholder (sometimes herein called a "Selling Shareholder") hereby agrees that, except as otherwise provided

21

in this Agreement, it will not effect or permit any Transfer of any of the shares of CDM now owned or hereafter acquired by such Selling Shareholder without the prior written consent of the other Shareholders, unless such Selling Shareholder shall have first made an offer to sell (an "Offer") as described in this Section 8(a) and such Offer shall not have been accepted in the manner described herein.

(ii) An Offer shall be made by the Selling Shareholder to the other Shareholders by means of a written notice specifying the shares of CDM (the "Offered Shares") that are to be the subject of the proposed Transfer. Such notice shall also contain or specify (A) a statement of the intention of the Selling Shareholder to effect the proposed Transfer; (B) the name and address of the proposed transferee; (C) the number of the Offered Shares; (D) the terms of the Transfer, including the proposed purchase price for the Offered Shares; and (E) if Claircom is the Selling Shareholder, a description of the proposed transferee in sufficient detail as to indicate the ability of such transferee to comply with the obligations of Claircom under the Venture Documents; provided, that the filing of a petition for the voluntary or involuntary bankruptcy of a Selling Shareholder shall be deemed to be a proposed Transfer of the shares of CDM held by such Selling Shareholder unless such bankruptcy proceeding shall be stayed or dismissed within 14 days after such filing, but the preparation and submission of the Offer in such case and the compliance by such Selling Shareholder with the other provisions of this Section 8(a) shall be subject to the provisions of applicable law.

(iii) Each Shareholder which shall have received an Offer from a Selling Shareholder may, at the option of such Shareholder, elect within thirty (30) days after its receipt of such Offer, to purchase its pro rata portion of the Offered Shares (as well as the portion of the Offered Shares not purchased by any other Shareholder) pursuant to the terms of the Offer. If the Offer shall not be accepted as to all of the Offered Shares by the Shareholders that shall have received the Offer as provided herein, the Selling Shareholder may transfer the Offered Shares

22

to the prospective transferee specified in the Offer statement as provided herein, such transfer to be made only in strict compliance with the terms set forth in such statement and to be completed within ninety (90) days following the expiration of the time provided for the other Shareholders to purchase the Offered Shares, after which period any such Transfer shall again become subject to all of the restrictions set forth in this Section 8(a).  In the case of any involuntary transfer, such as by way of an involuntary bankruptcy or creditor's attachment, then subject to the provisions of applicable law the purchase price to be deemed to be specified in the applicable Offer shall be equal to the fair market value of the Offered Shares as determined by an appraiser selected by CDM.

(iv) No Transfer of any right, title or interest in or to any shares of CDM by any Shareholder thereof shall be effective, and CDM shall not record or recognize any such Transfer, unless and until there has been compliance with this Section 8(a) with respect to such Transfer.  The Shareholders agree that they will instruct the Board of Directors of CDM not to approve any transfer of shares of CDM unless such transfers comply with the provisions of this Section 8(a).

(v) Anything in this Section 8(a) to the contrary notwithstanding, if an Offer from a Selling Shareholder shall be accepted by another Shareholder such Selling Shareholder may seek a counter-offer from the original prospective transferee at a higher purchase price, and if such Selling Shareholder shall receive any such counter-offer and notify the other Shareholders of such counter-offer within thirty (30) days after the acceptance of the original Offer, such counter-offer shall be deemed to be an Offer for all purposes of this Section 8(a).

(vi) Unless otherwise mutually agreed by the parties involved, the closing of any purchase of Offered Shares from a Selling Shareholder by any of the other Shareholders shall take place at the principal office of CDM on the twentieth (20th) Business Day after the date on which the Selling Shareholder

23

shall receive the notice by the other Shareholder(s) of an election to purchase the Offered Shares.

(b) Sale Option.  In addition to the right of the Mexican Shareholders to make a Transfer or Transfers of any of their shares of CDM to another Person or Persons pursuant to paragraph (a) of this Section 8, subject to Claircom's statutory right of first refusal, each of the Mexican Shareholders shall have the right, at any time on or before the date on which the Term of this Agreement shall terminate, to sell to Claircom, and Claircom shall be obligated to buy, their shares of the capital stock of CDM at a purchase price in Dollars equal to the Dollar equivalent, at the time the respective investment was made, of the amount of such Shareholder's investment in CDM, plus 15% compounded annually from the date of such investment to the date of such purchase; provided, that (i) if at the time of exercise by a Mexican Shareholder of the foregoing option the purchase by Claircom of the corresponding shares shall not be permitted under applicable Mexican law, such Mexican Shareholder shall seek another purchaser of such shares and Claircom shall use its best efforts to assist such Mexican Shareholder in effecting the sale of such shares at such price as such purchaser may agree to pay, and (ii) it shall be a condition precedent to the exercise by a Mexican Shareholder of the foregoing option that such Mexican Shareholder shall not be in material breach of its obligations under this Agreement at the time of such exercise.

SECTION 9.  CROSS-BORDER REVENUE SHARING.  The Cross-Border Revenues for the U.S./Mexican Systems shall be for the account of CDM and Claircom as follows:

(a) Claircom and CDM shall each be entitled to receive 50% of the Cross-Border Revenues.

(b) Claircom, as collection agent, shall pay CDM 50% of the Cross-Border Revenues collected by Claircom, within thirty (30) days after the end of each fiscal quarter of Claircom during which Claircom shall have collected such Revenues.

24

E950003.JER