**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| CLAIRCOM DE MEXICO, a Mexican corporation, CONTROTITULOS, S.A. DE C.V., a Mexican Corporation, and GLOBALCOM, S.A. DE C.V., a Mexican Corporation,<br><br>        Plaintiff,<br><br>        v.<br><br>AT&T WIRELESS SERVICES, INC. (n/k/a NEW CINGULAR WIRELESS SERVICES, INC.),<br><br>        Defendant. | Case No.: CV05-1045 JLR<br><br>DECLARATION OF ALAN H. GOREE IN SUPPORT OF DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT |

ALAN H. GOREE, declares under the penalty of perjury as follows:

1.      I am the former Director of Business Management of Claircom Communications Group, Inc. ("CCG") and a current employee of New Cingular Wireless Services, Inc. I am over the age of 18 and I make this declaration based on personal knowledge and information I have received in the normal course of my job duties with CCG and NCWS.

2.      CCG originally was a subsidiary of McCaw Cellular Communications, Inc., and later of AT&T Wireless Services, Inc. ("AWS"). AWS subsequently merged with Cingular Wireless LLC and is now known as New Cingular Wireless Services, Inc.

DECLARATION OF ALAN H. GOREE IN SUPPORT OF DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - CV05-1045 JLR

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

34001-429\ 221351.doc        -1-

3.     I was the Director of Business Management at CCG from approximately to June 2000 to November 2003. In fact, from May 2003 through October 2003 I was the *only* full time employee of CCG. CCG ceased operations in November 2003.

4.     As the Director of Business Management, I was familiar with the business relationship between CCG and Claircom de Mexico ("CdM") and the Joint Venture Operating Agreement ("JVOA") between CCG, CdM and its two Mexican Shareholders, Controtitulos and Globalcom ("the Mexican Shareholders"). The terms and conditions of the joint venture are outlined in the Joint Venture Operating Agreement ("JVOA") which is attached hereto as Exhibit A.

5.     CCG developed, built and operated an air to ground telephony network that allowed passengers on commercial and private aircraft to make telephone calls during flight. CCG contracted with several major domestic and international airliners to develop, make, install and maintain telephone equipment in the passenger aircraft.

6.     CCG also built a network of ground stations (radio towers) across North America that connected the wireless calls from the aircraft to the wired telephone network. The network of ground stations was called North American Terrestrial System ("NATS").

7.     CCG and the two Mexican Shareholders entered into the joint venture called CdM to obtain a license from the Mexican Ministry of Communications and Transport (the "SCT License") to operate ground stations in Mexico that would integrate with CCG's NATS.

8.     There were three primary financial issues in the JVOA:

a.     Network Contribution Fee ("NCF"): CdM was obligated to pay the Mexican Shareholders a NCF, which was essentially 1% of CCG's NATS revenue less certain commissions and expenses. CCG guaranteed CdM's payment of the NCF to the Mexican Shareholders. JVOA §5(b). Between 1997 and 2002, CCG paid the Mexican Shareholders in excess of $1.5 million in NCF payments.

b.     Cross Border Revenue ("CBR"): CCG and CdM were each entitled to an equal share of all revenue generated on international flights and/or domestic flights

DECLARATION OF ALAN H. GOREE IN SUPPORT OF DEFENDANT'S
RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT - CV05-1045 JLR

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

34001-429\ 221351.doc                    -2-

within Mexico that utilize ground stations within 50 miles of the U.S./Mexican border. JVOA §9.

        c.      Excess Cash Requirements ("ECR"): CCG was obligated to advance cash to CdM if CdM's revenues failed to meet its capital and operating requirements. JVOA §6(a). CdM's revenues *always* failed to meet its capital and operating requirements and between 1995 and 2002, CCG funded CdM $5.176 million in ECR.

      9.      Although CCG installed its equipment on a number of large commercial passenger airlines, several factors prevented it from ever realizing a profit. Neither the revenue generated from the NATS service nor that generated by sales ever covered the costs to develop, deploy and maintain the network of ground stations across North America or the costs to develop, build, install and maintain equipment on more than 1,500 aircraft.

      10.      In addition, CCG's business had been based largely on a certain demand for the NATS service, specifically a particular number of passenger calls per plane per day. These call volumes were never achieved, and after 9-11, the number of passengers on commercial airlines declined sharply. In addition, a number of airlines revised their policies and began permitting the use of personal cellular telephones on board the aircraft when the aircraft was not in flight.

      11.      Because of the continuing losses, CCG sought to limit or even reduce its contractual obligations. Initially, CCG sought to limit or reduce the number of commercial aircraft in which it was obligated to install equipment and to limit or reduce the length of its contractual terms with its airline customers.

      12.      It also sought to reduce its costs by out-sourcing certain equipment maintenance and repair obligations and other services it was contractually obligated to provide. CCG also sought to reduce its costs by discontinuing new products and downsizing its staff.

      13.      However, so long as CCG had a commercial airline customer it intended to continue to operate the NATS.

      14.      After 9-11, many of CCG's commercial airline customers, which were themselves suffering enormous losses, also sought to reduce their costs and simplify their operations. Rather

DECLARATION OF ALAN H. GOREE IN SUPPORT OF DEFENDANT'S
RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT - CV05-1045 JLR

34001-429\ 221351.doc

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1  than reduce the number of aircraft or the length of the contractual terms, the airlines agreed to

2  remove the telephony equipment and terminate the contracts.

3      15.    It was not until September 2002, that all of CCG's obligations to provide NATS

4  service to its commercial airline customers ended and it had firm plans to decommission the

5  NATS network.

6      16.    CCG was obligated under the terms of the JVOA to pay the Mexican

7  Shareholders a quarterly Network Contribution Fee ("NCF").

8      17.    The NCF due to the Mexican Shareholders for the third quarter of 2002 was

9  calculated to be $1,644, considerably smaller than the NCF had been in prior quarters.

10     18.    CCG had paid the Mexican Shareholders the NCF payments due for every quarter

11 between June 1997 (when the first ground station was built in Mexico) until the second quarter

12 of 2002.

13     19.    Because the payment for the third quarter of 2002 was significantly smaller than

14 prior NCF payments paid in prior quarters, before paying it, CCG intended to communicate with

15 the Mexican Shareholders the circumstances of CCG's business operations, including the

16 declining revenues from NATS and the continuing obligations it had with its commercial airline

17 customers, and to further discuss with the Mexican Shareholders their expectations and a strategy

18 for future business operations. That discussion did not take place, and the $1,644 payment was

19 not sent. CCG was at this time working to outsource its remaining obligations, decommission its

20 network, and otherwise operate with limited resources.

21     20.    Based on my knowledge of the company, no judgment in excess of $250,000 was

22 ever entered against CCG for which enforcement proceedings were commenced. CCG never

23 failed to pay its debt. No insolvency or bankruptcy proceedings were instituted by or against

24 CCG at any time. No proceedings seeking liquidation or reorganization of CCG were instituted

25 under any law. No proceedings were instituted seeking to appoint a receiver for CCG.

26 Likewise, no "corporate action" authorized any of those types of events.

27

DECLARATION OF ALAN H. GOREE IN SUPPORT OF DEFENDANT'S
RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT - CV05-1045 JLR                          STOKES LAWRENCE, P.S.
                                                  800 FIFTH AVENUE, SUITE 4000
                                                  SEATTLE, WASHINGTON 98104-3179
34001-429\ 221351.doc              -4-            (206) 626-6000

1    21.    During the time I was Director of Business Management at CCG, I do not recall

2  ever being contacted by the Mexican Shareholders at any time prior to their attorney sending a

3  letter in March 2004.

4    22.    Had the Mexican Shareholders contacted anyone at CCG, I would have been the

5  individual to whom they were directed. Notably, the first contact by the Mexican Shareholders

6  that anyone at CCG/AWS knew about, the March 2004 letter to Mr. Zeglis, says nothing about

7  the third quarter 2002 NCF payment.

8    **I declare under penalty of perjury under the laws of the United States of America**

9  **and of the State of Washington that the foregoing is true and correct.**

10    EXECUTED at Redmond, Washington, this 8th day of May 2006.

11

12    _____

     Alan H. Goree

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF ALAN H. GOREE IN SUPPORT OF DEFENDANT'S
RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY          STOKES LAWRENCE, P.S.
JUDGMENT - CV05-1045 JLR                                     800 FIFTH AVENUE, SUITE 4000
                                                             SEATTLE, WASHINGTON 98104-3179
34001-429\ 221351.doc                      -5-                  (206) 626-6000